■ ELMSMERE ASSOCIATES, Appellant-Respondent, v KENNETH GLADSTONE et al., Respondents-Appellants.—Appeal from the orders of the Supreme Court, New York County (Louis Grossman, J.), entered on or about November 30, 1983 and on or about June 19, 1984, respectively, is dismissed as superseded by the appeal from the judgment entered on November 18, 1987, without costs and without disbursements.

Judgment of the Supreme Court, New York County (Irving Kirschenbaum, J.), entered on November 18, 1987, which, following a trial without a jury, dismissed with prejudice plaintiff's complaint and directed that defendants recover from plaintiff the sum of $562 as costs and disbursements, is modified on the law to the extent of reinstating the first cause of action, entering judgment in favor of plaintiff on the first cause of action with respect to the issue of liability, remanding the matter for an assessment of damages in accordance with this court's opinion, vacating the imposition of costs against plaintiff, and otherwise affirmed, with costs and disbursements to plaintiff.

Plaintiff Elmsmere Associates, a family partnership whose principal is Abraham Feinberg, and defendants Kenneth and Lucille Gladstone, a husband and wife team of builders, formed a partnership in 1968 known as Sixth Avenue Associates. The sole asset of this partnership was real property, consisting of a restaurant and nine-story parking garage, adjoining the CBS, Inc. building at West 52nd Street. The

property, which was subject to three separate mortgages, was initially managed and controlled by Feinberg, but in 1976 he declined to operate the property further or to make any required payments and voluntarily relinquished full management authority to defendants. When the first mortgagee, Central States Pension Fund, thereupon commenced a foreclosure action in 1977, the Gladstones, after two years of negotiation, reached a forebearance agreement with the mortgagee's representative, Equitable Life Assurance Society of the United States. Apparently in exchange for Feinberg's cooperation in the closing of the forebearance agreement, Elmsmere demanded a written partnership agreement, as well as a declaration that the Gladstones were taking title to the 52nd Street property on behalf of Sixth Avenue Associates. Accordingly, a written agreement was executed which provided that the Gladstones would assume all management power with respect to the property but that Elmsmere, having been assigned 47.5% of the partnership, would still have to contribute its proportionate share of the operating costs and expenses. In addition, the contract stated that the Gladstones would "consult with Feinberg on a reasonable basis * * * and keep Feinberg reasonably advised from time to time with regard to all matters concerning the Partnership's business".

From April of 1979 until January of 1981, defendants expended approximately $1.5 million in connection with the property while plaintiff failed to contribute any funds. During that period, the Gladstones explored a variety of development options for the site. They pursued the acquisition of a parcel adjoining the rear of the western half of the property, owned by the Gerard Group, and they also paid $30,000 to the Donnell Library, which owned another adjacent property, to fund a study to determine whether air rights could be transferred to them. Defendants, moreover, investigated the feasibility of either purchasing or entering into joint venture to develop adjoining properties owned by the Baron De Portanova and CBS. CBS refused to participate in a joint venture and unsuccessfully endeavored to persuade the Gladstones to sell it the property. In September of 1980, CBS abandoned its efforts to obtain the 52nd Street site and, instead, sought to arrange a sale of its own property to a developer. CBS eventually reversed its position again and decided to develop the property rather than dispose of it.

In March of 1980, defendants entered into a contract with the holder of the parking garage lease which, in effect, enabled them to proceed with development of the property. The

Gladstones also made payments both to bring the first mortgage current and satisfy the second mortgage. It is undisputed that plaintiff repeatedly indicated that it had no desire to share in the costs or risks of developing the site, and, consequently, discussions ensued involving the possibility of a buyout by the Gladstones of Elmsmere's interest in Sixth Avenue Associates. Ultimately a purchase price of $1.9 million was established, and the parties' attorneys prepared a number of drafts of a proposed purchase agreement, the final form of which contained a section whereby plaintiff stated as follows: "4.8 Seller represents that, except as set forth in this Agreement, Purchaser made no representations to Seller with respect to the premises known as 27-39 West 52nd Street, New York, New York (the 'Premises'), including but not limited to the physical condition thereof, the use to which it may be put, the expenses of operation and maintenance thereof, the financing or ability to finance the Premises, the rental income thereof, the zoning status of the Premises, the ability to develop the Premises, any offers received to purchase or develop the Premises, or anything else relating to the Premises. To the extent that Seller is not aware of, or familiar with, any of the foregoing items concerning or affecting the Premises, Seller was not concerned with nor did it base its decision (in whole or in part) to sell the Interest to Purchaser at the price set forth herein on any of such items, Seller having relied on its own judgment in deciding to sell the Interest at the price set forth herein and Seller hereby waives any claim against Purchaser from, any and all liability or obligation in connection with any of such items except as set forth in this Agreement."

At the end of article 5, an unnumbered paragraph was inserted providing that: "The foregoing warranties, representations and agreements shall survive the Closing Date insofar as Purchaser hereby indemnifies and holds Seller harmless from and against any cost, claim, liability, damage or expense (including but not limited to reasonable attorney's fees) resulting from any breach by Purchaser of the foregoing warranties, representations or agreements. However, Seller shall not have the right to rescind this Agreement by virtue of any such breach or by reason of such claims or demands."

Elmsmere and the Gladstones signed the agreement in late January or early February of 1981 but did not exchange instruments. Shortly before the scheduled closing, Feinberg advised defendants that he wished to add language to the purchase agreement stating that the Gladstones were acquir-

ing the interests of Elmsmere in order to build on the site. Plaintiff's attorney also contacted defendants' counsel to communicate Feinberg's insistence that the inclusion of such a clause be a condition of his proceeding with the transaction. The result was section 5.9, which asserted that: "Purchaser is acquiring the Interest with the intention of constructing a new high-rise building on the Premises. Purchaser shall commence substantial construction activity for such new buildings within two years from the date hereof. Any claim by Seller based on a representation by Purchaser under this Section 5.9 must be asserted by Seller in a lawsuit commenced within three years from the date hereof or otherwise shall be waived."

Plaintiff's lawyer was responsible for the phrasing of the first two sentences, and, indeed, suggestions by the Gladstones' attorney that "substantial construction activity" be changed to "development activity" and that the word "substantial" be deleted were rejected. The closing under the purchase agreement did not occur until after the acceptance of section 5.9 by both parties.

Following the transfer of Elmsmere's interests in the property to defendants, they retained an architect, mechanical engineer, seismologist, traffic consultant, construction manager, building code consultant and land use counsel in preparation for the development of the site. Thus, in May of 1981, plans were filed with the New York City Building Department to erect a 56-story building on the property. Further, the Gladstones paid $250,000 to the restaurant tenant for surrender of its leasehold, and the restaurant space was stripped and structurally examined. In January of 1982, a permit for a new 104-car accessory garage was approved, and defendants procured a commitment from Chase Manhattan Bank for a $58 million construction loan. During 1981, the Gladstones had also continued to explore expansion of the site with owners of adjoining parcels, specifically Baron De Portanova, the American Arts Council and CBS. All work on project, however, abruptly ceased in January of 1982 and was never resumed. Instead, defendants responded favorably to an offer to sell their property to the joint venture group which had recently been formed between CBS and the Gerald D. Hines Interests. On September 1, 1982, the Gladstones contracted to sell the subject property to the CBS-Hines venture for $18 million, and the closing took place on October 26, 1983.

When Feinberg did not observe any excavation work or other visible signs of construction by the second anniversary

of the partnership interest buyout, and defendants failed to reply to his inquiries, he instituted the instant action. The complaint asserted four causes of action, the first for breach of contract, the second for rescission on the same breach of contract theory, the third for violation of fiduciary duty and the fourth for the fraudulent inducement of Elmsmere to enter into the purchase agreement. Only the first and part of the fourth causes of action survived motion practice, and, after a nonjury trial with respect to these claims, the court found no merit to either of the two remaining allegations and dismissed the balance of the complaint. In that regard, the Trial Judge concluded that plaintiff is not entitled to damages for breach of contract since "the extensive and costly activity carried out by the Gladstones was 'substantial construction activity' " in compliance with section 5.9 of the purchase agreement and was "carried out in good faith of the plan to build a high-rise building." According to the court, "[t]here can be no question that the construction of a large building in midtown Manhattan requires extensive preparatory work of the type carried out by the Gladstones, before physical construction work can begin." We disagree.

At the outset, it should be noted that two separate Supreme Court Judges were properly unpersuaded by defendants' contention that section 5.9 was intended to be no more than an indemnity for third-party claims. Indeed, this provision, while adopted at the last minute, was crucial to the underlying agreement since Feinberg had expressed an unwillingness to consummate the arrangement in the absence of such a clause. However, the trial court's determination that the contractual requirement of "substantial construction activity" could be satisfied by preparatory work is belied by the fact that plaintiff refused defendant's request that the term "substantial construction activity" be altered to "development activity" and also that the word "substantial" be deleted. The court appears to have been under the impression that because defendants engaged in certain activities with respect to the subject property after the purchase agreement went into effect, there was no need for them to have actually undertaken construction, thereby ignoring the clear mandate that the activity being contemplated was not any activity but specifically "construction activity". Certainly, the record herein demonstrates no actual construction work by defendants, merely architectural and other developmental planning that might or might not ultimately lead to construction and, in the instant situation, did not. The sole physical act per-

formed in relation to the property was the stripping of the restaurant premises and the insertion of probes, which seems to have been done primarily for testing purposes, and this scarcely amounts to substantial demolition activity, much less substantial construction activity.

The law is settled that in construing a particular agreement, "due consideration must be given to the purpose of the parties in making the contract * * *. A fair and reasonable interpretation, consistent with that purpose, must guide the courts in enforcing the agreement" *(Matter of Cromwell Towers Redevelopment Co. v City of Yonkers,* 41 NY2d 1, 6). Further, it is axiomatic that the words and phrases used in a contract must be given their plain meaning *(Laba v Carey,* 29 NY2d 302, *rearg denied* 30 NY2d 694). The plain, ordinary meaning of construction as it pertains to buildings is something more than the preparation for construction; it necessitates the physical demolition and/or erection of a structure. The evidence also clearly reveals that Feinberg was intent on selling his interests in the property only in the event that the Gladstones were going to develop and build on the land. Feinberg's desire to prevent defendants from turning over the property to a third party at a large profit was evidently precisely the reason why he insisted on the inclusion of section 5.9 in the agreement. Thus, he was willing to remain in possession of the property as an investor or speculator but not as a developer, and the purpose of the clause was to ensure that if the Gladstones did not comply with their commitment to build, then they would have to share with plaintiff any profits derived from a resale of the property.

Defendants, having failed to "commence substantial construction activity for such new building within two years from the date hereof", are now liable to plaintiff for restitutionary damages for breach of contract. Consequently, the present matter is remanded to the Supreme Court to calculate the measure of the contract damages, which, in the present instance, should appropriately be 47.5% (representing plaintiff's ownership interest prior to the purchase agreement) of the sale price less the amount of the buy-out payment already received by plaintiff and also minus the costs and expenses to defendants involved in managing the property before the buyout by them of Elmsmere's interests in Sixth Avenue Associates. Concur—Sullivan, J. P., Carro, Milonas and Smith, JJ.

Ellerin, J., dissents in a memorandum as follows: I dissent and would affirm the judgment in its entirety for the cogent

reasons set forth in the decision rendered by Justice Kirschenbaum, after trial.

The finding that defendants fully intended to construct a building on the property in question is amply supported by the record. Moreover, the trial court's interpretation of the phrase "substantial construction activity" as not being synonymous with physical construction, as plaintiff urges, is a most reasonable and realistic one. The detailing in the decision of the extensive steps taken by defendants, including among others the retention of an architect, mechanical engineer, construction engineer and various other experts, the filing of plans with the Building Department and the procuring of a bank commitment for a $58 million construction loan, more than support his conclusion that defendants had, as required under the agreement, commenced substantial construction *activity*.